**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRENDA J. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0855-WS-C** |
| | ) | |
| **GENERAL INSURANCE COMPANY** | ) | |
| **OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 48).  The Motion has been extensively briefed and is ripe for disposition.[1]

**I.      Background Facts.**[2]

Plaintiff, Brenda J. Jones, has brought claims against defendant, General Insurance Company of America ("GICA"), for breach of insurance contract, bad-faith refusal to pay, and abnormal bad faith under Alabama law.  (*See* Amended Complaint (doc. 36).)  These state-law causes of action arise from alleged Hurricane Katrina damage to Jones' residence in August 2005, and her ensuing dispute with GICA over whether and to what extent she was entitled to insurance benefits to compensate her for that damage.  The logical starting point for summary judgment purposes is an overview of the insurance policy itself, followed by examination of the

---

[1]      Both parties have requested oral argument.  Pursuant to Local Rule 7.3, the Court in its discretion may rule on any motion without oral argument.  After careful consideration of the parties' voluminous briefs tallying in excess of 100 pages (including multiple memoranda that well exceed the applicable page limits, albeit with leave of court) in this insurance coverage and bad faith dispute, the undersigned is of the opinion that oral argument would not be of substantial assistance in resolving the issues presented.  Accordingly, the parties' requests for oral argument are **denied**.

[2]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).   Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

record evidence concerning the loss to Jones' property, her claims to GICA for insurance coverage, and GICA's investigation, processing and disposition of those claims.

       **A.**       ***The Policy.***

       As of early 2005, Jones financed the mortgage loan for her residence at 1712 Chase Drive, Saraland, AL (the "Property"), through non-party Washington Mutual Bank, FA ("WaMu"). (Jones Dep., at 48-49.) The record reflects that Jones had explored the possibility of procuring homeowners' insurance through various agencies, but that she had ultimately not entered into insurance contracts with any of them because the rates quoted were higher than she could afford. (*Id.* at 40-41.) However, plaintiff's lender, WaMu, demanded insurance coverage on the Property as a condition of its mortgage agreement with Jones. On that basis, GICA sent Jones a letter dated February 15, 2005, informing her as follows:

> "Your lender's records indicate that you have not provided them with acceptable evidence of continuous insurance coverage on the above property. In order to protect their interest in the property, they have ordered coverage in accordance with the terms of your Deed of Trust / Mortgage. Please be aware that you will be responsible for the insurance charges for this coverage."

(Doc. 53, Exh. A, at 128.)[3] In industry parlance, then, WaMu arranged for GICA to issue "force

---

      [3]      Defendant has submitted as Exhibit A to its Motion what appears to be its entire 547-page claims file (with the possible exception of certain privileged entries) related to Jones' Hurricane Katrina claim. The vast majority of this voluminous exhibit is not referenced in the parties' summary judgment submissions. The same can be said of defendant's Exhibit B, which appears to be the entire master insurance policy, spanning more than 100 pages, only a sliver of which appears to have any bearing on the particular claims and defenses joined herein. This tactic of dumping superfluous, unexcerpted exhibits in the court file for the Court to sift through is improper, and contravenes the Local Rules' directive that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." LR 5.5(c). Although GICA's evidentiary submission will be accepted as filed, this Court will not scour the uncited portions for any scrap of evidence that may advance movant's position. *See, e.g., Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file

place insurance"[4] on the Property, with Jones bearing responsibility for the premiums, in accordance with the relevant mortgage provisions.

The February 15 letter referenced Master Policy # MIO7710371B (the "Policy"), indicated that the insured was "Washington Mutual Bank, FA, its Successors and/or Assigns," and listed a policy period of 10/01/2004 through 10/01/2005.  (*Id.*)  The Policy provided coverage for "the dwelling on the 'insured location' shown in the coverage letter, including structures attached to the dwelling."  (*Id.* at 290.)  It is undisputed that the "insured location" for purposes of this case is Jones' residence in Saraland.  Jones was not named as an insured in the Policy, but she was the "borrower," a defined term in the Policy meaning "the mortgagor or mortgagors of an 'insured location' indebted under a mortgage held or serviced by" the named insured, WaMu.  (*Id.* at 289.)  The record is clear, then, that GICA provided coverage for the Property pursuant to the Policy, as to which WaMu was the sole named insured.  (Reinhard Aff., at 1.)  Jones was listed as neither a named insured nor an "additional insured" in any Policy documents.[5]

A critical Policy provision for purposes of the pending motion is the "Loss Payment" clause.  That section stated as follows, with respect to coverage of the Property:

> "We will adjust all losses with [WaMu].  We will pay [WaMu] but in no event more than the amount of [WaMu's] interest in the 'insured location.'  ***Amounts payable in excess of [WaMu's] interest will be paid to the 'borrower' unless***

---

which support their assertions regarding whether genuine issues remain for trial."); *Vigor v. City of Saraland*, 2008 WL 5225821, *1 n.1 (S.D. Ala. Dec. 11, 2008) (similar).

[4]       The undersigned's research, and the parties' own filings, reflect that this term is variously called "force place insurance," "forced placed insurance," "forced place insurance" or "force placed insurance."  The Court makes no findings as to which of these permutations is technically most accurate; however, in the interest of consistency, the term "force place insurance" will be used in this Order to describe the coverage procured by WaMu for the Property.

[5]       That said, in correspondence during the claims-handling process, GICA acknowledged Jones' relationship to the Policy.  For example, in a letter dated September 14, 2005, GICA referenced the Policy as being "issued by General Insurance Company of America to Washington Mutual Bank, Fa and to Brenda Jones."  (Doc. 53, Exh. A, at 493.)  Similarly, in a letter dated February 24, 2006, GICA furnished Jones' lawyer with Policy documents "that pertain[] to the Homeowners coverage we carry for Brenda K. [*sic*] Jones."  (*Id.* at 288.)

*some other person is named by the 'borrower' to receive payment.*"
(*Id.* at 300 (emphasis added).)  By its plain terms, then, the "Loss Payment" section of the Policy reflected that, in the event of a covered loss to the dwelling, GICA would pay WaMu (the named insured) up to the amount of WaMu's financial interest in the Property, then would pay all covered amounts in excess of WaMu's interest to Jones.  Elsewhere, the Policy underscored Jones' right to payment via a "Limit of Liability" clause providing that GICA would not be liable "to a 'borrower' for more than the amount of a 'borrower's' interest at the time of the loss."  (*Id.* at 298.)  Other provisions in the Policy, such as the "Duties After Loss" section, made clear that notice of loss, proofs of loss, mitigation measures, and the like were duties imposed on the "borrower," as well as WaMu.  (*Id.*)

In total, the Policy provided for $80,000 in coverage to the dwelling (plus $8,000 in coverage to other structures) for covered perils, as well as an additional $40,000 in personal property coverage and $100,000 in personal liability coverage.  (*Id.* at 128; Jones Aff. (doc. 62-8), at 1 & January 18, 2005 exhibit.)[6]  The annual premium for all such coverages was $960. (Doc. 53, Exh. A, at 128; Jones Aff,, at January 18, 2005 exhibit.)  The Policy was in effect on August 29, 2005, the alleged date of loss in this case.  It is undisputed that wind is a covered peril under the Policy.

The record does not delineate the arrangements between WaMu and Jones concerning the Policy nor does it identify the total amount due on Jones' mortgage loan with WaMu during the relevant time period; however, it does indicate that the WaMu mortgage was paid in full as of

---

[6]        Plaintiff has attached a number of exhibits to the Jones Affidavit dated January 20, 2009; unfortunately, neither the exhibits themselves nor the paragraphs of the Affidavit are numbered, rendering it cumbersome to identify them by citation.  Notwithstanding this defect, the relevant exhibit is a GICA form signed by Jones on January 18, 2005, confirming these coverages and liability limits, and formalizing her request that GICA "add personal property and liability coverage to [her] lender placed dwelling policy."  Thus, Jones added certain voluntary coverages to the Policy during the relevant period; however, those additional coverages did not include property coverage for wind damage to the dwelling and garage, and are therefore not relevant to the analysis herein.  No party has maintained otherwise.  Moreover, the "Loss Payment" provision for these voluntary coverages deviates substantially from that for the property coverage that lies at the heart of this dispute.  Plaintiff having ascribed no practical significance to those voluntary coverages in this case, the Court will not examine them further.

October 16, 2007.  (Jones Aff., at 2 & December 1, 2008 exhibit.)[7]

    **B.    The Loss.**

    In the early morning hours of August 29, 2005, Hurricane Katrina came ashore east of New Orleans, carving a massive swath of destruction along the Louisiana, Mississippi, and Alabama coasts.[8]  On or about September 3, 2005, Jones contacted GICA to report alleged wind damage to the Property arising from the storm.  (Doc. 53, Exh. A, at 499.)[9]  At that time, Jones reported the following damage:  missing shingles from her roof, cracks and splits in the ceilings, warped doors, wood separating from the floor, shifting of the top floor by approximately one inch, buckled paneling in the recreation room, felled trees, and overall shifting of the house.  (*Id.* at 539, 546.)  In addition to these items, Jones now alleges that Hurricane Katrina caused damage to the following further aspects of her Property: roof; ridge beam, rafters and supports in the attic and garage; internal and external doors; certain windows (manifested by, *inter alia*, fogged windows); walls, rafters and floors; countertops and cabinets; and vinyl siding.  (Jones Aff., at 1.)  Plaintiff complains of damage by wind, not rain or flood, although she does identify some water damage in the recreation room downstairs.  (*Id.*)  Plaintiff's evidence, which must be taken as true for summary judgment purposes, is that, prior to Hurricane Katrina, there was no such visible damage to the Property's doors, floors, windows, walls, rafters, countertops, cabinets or siding.  (*Id.*)

------

    [7]    Elsewhere in the record is a notation that appears to reflect that Jones paid off her loan balance to WaMu in full on December 1, 2006.  (Doc. 53, Exh. A, at 160.)  Either way, it is evident that there was an outstanding loan balance in fall 2005 when Jones made her claim on the Policy, such that WaMu possessed an insurable interest in the Property at that time.

    [8]    As the record points out, however, the eye of Hurricane Katrina made landfall in Plaquemines Parish, Louisiana, well to the west of Mobile, Alabama.  (Doc. 53, Exh. A, at 356.)  As stated in the record, the maximum sustained winds recorded at Mobile Regional Airport during Hurricane Katrina were 66 mph, with maximum gusts of 83 mph.  (*Id.*)

    [9]    The Property is described in the record as a two-story, single-family dwelling with a concrete slab foundation, wood-framed walls, and a gabled roof structure, and including a total of 2,320 square feet.  (*Id.* at 354.)  Exterior walls of the dwelling are clad with vinyl siding, while the interior walls are gypsum wallboard.  (*Id.* at 355.)  The house was built in 1977.  (*Id.*)  Also on the Property are a swimming pool, a detached two-car garage with a gabled roof and wood siding, and an east shed with wood siding and composition shingles.  (*Id.*)

### C.     The Claim and Investigation.

On September 10, 2005, just a week after Jones established contact with GICA concerning her Hurricane Katrina claim, a GICA field adjuster named Kristi Talley met with Jones and inspected the Property.  (Doc. 53, Exh. A, at 513-14, 532.)  Based on that inspection, Talley concluded, "Cause of loss is hurricane," and identified the following areas of damage: (a) the south slope of the roof, which was wind-damaged to the point that it was "not repairable and require[d] replacement" of all shingles; (b) the flashing where the patio cover connects to the dwelling was in need of repair; (c) the north elevation had damage to the painted railing and minor damage to siding; (d) water damage in the bedroom and one bathroom; (e) damage to wood fence from a felled tree; and (f) minor wind damage to the garage roof.  (*Id.* at 513-14.)  In addition to these items, Talley's report reflected that Jones was also claiming other damage, specifically cracks in the drywall, doors not shutting properly, and a crack in the kitchen flooring, all of which would require examination by an engineer.  (*Id.*)  These latter items related to Jones' broader concern that Hurricane Katrina had caused the Property's foundation to shift, which Talley determined would require further investigation to ascertain whether the reported damage arose from a covered peril under the Policy.  (*Id.* at 500.)

On September 14, 2005, GICA issued a claim settlement check to WaMu for the Property in the amount of $2,173.28, covering removal of the fallen tree; repairs to the garage roof, handrails, siding, and fencing; replacement of the south slope of the roof; and repainting of ceilings in bathroom and bedroom.  (*Id.* at 495-511.)  The settlement check reflected reductions for a $1,000 deductible and depreciation of $908.93.  (*Id.* at 495.)  In October 2005, WaMu endorsed this GICA settlement check and forwarded it to Jones, such that she ultimately received the full amount of these insurance proceeds.  (Jones Aff., at 2 and exhibit dated October 6, 2005.)[10]

---

[10]     Two other Katrina-related claims by Jones were timely addressed by GICA.  On October 6, 2005, Jones contacted GICA to apprise them of damage to her swimming pool, including cracks and water leakage.  (Doc. 53, Exh. A, at 414.)  On October 7, 2005, Jones faxed GICA an estimate from a contractor indicating, *inter alia*, that a fallen tree and branches from the storm had punctured the pool liner, requiring that it be replaced.  (*Id.* at 407-10.)  Four days later, on October 11, 2005, GICA issued a check to WaMu in the amount of $2,525, covering the cost of a new vinyl liner, plus installation charges, less $350 in depreciation.  (*Id.* at 403-04.)

The September 14 settlement check did not conclude Jones' insurance claim, however, as the items requiring inspection by an engineer remained unresolved.  By separate letter on September 14, 2005, GICA notified WaMu that coverage had been requested for foundation movement, and that an engineer would inspect the Property to determine whether any such damage to the Property resulted from a covered peril.  (Doc. 53, Exh. A, at 493.)  GICA promptly retained Texas-based Haag Engineering Co. to inspect the Property.  (*Id.* at 464-67, 472-73, 486.)  On September 30, 2005, a Haag Engineering representative met with Jones, Jones' family members, Jones' contractor, and another GICA adjuster to inspect the Property.  (*Id.* at 418-20.)  The Haag engineer conducted a room-by-room inspection of the Property at that time, examining each of the concerns that Jones identified during the walk-through.  (*Id.*)  It is uncontroverted that the Haag engineer did enter and inspect the attic, although the parties dispute the extent of his examination of that area.  (English Dep., at 145-49.)

On November 3, 2005, Haag issued a detailed written report of its inspection of the Property.  (*Id.* at 353-65.)  The Haag report reflected that the Property "had minimal wind damage," as evidenced by the minor shingle damage; the absence of damage to siding, fascia, soffits and trim; and the intact status of most wind-susceptible components around the building perimeter.  (*Id.* at 357.)  Based on these observations, Haag concluded that "[c]learly, this house was not subjected to wind forces that could damage the structure or distort the frame enough to

---

WaMu promptly endorsed and forwarded that check to Jones, who received the full use and benefit of those insurance proceeds.  (Jones Aff., at 2 and exhibit dated October 21, 2005.)  On October 25, 2005, Jones called GICA again, advising that her contractors had reported that they could not replace the liner without also replacing grout material under the liner.  (Doc. 53, Exh. A, at 394.)  GICA investigated, and on November 2, 2005 notified WaMu and Jones in writing that no coverage existed for the grout because that was a maintenance issue excluded by the Policy.  (*Id.* at 385-93.)  Jones persisted that the grout should be covered, after which GICA re-opened its investigation of that part of the claim.  (*Id.* at 374-83.)  On November 12, 2005, GICA determined that a partial regrout of the pool would be covered under the Policy to repair grout scarred by felled tree limbs in the Hurricane.  (*Id.* at 345-47.)  On that basis, GICA issued another settlement check of $950 to WaMu to cover the cost of the partial regrout.  (*Id.* at 345.)  Once again, WaMu endorsed and forwarded that check on to Jones.  (Jones Aff., at 2, and exhibit dated November 21, 2005.)

cause finish cracks." (*Id.*)[11]  Haag likewise found no evidence to support Jones' suggestion that the house had been twisted or torqued by hurricane winds.  In that regard, Haag noted that a wood-framed structure cannot be twisted by the wind "without obvious damage, particularly at the building corners," which simply was not present here, as the building corners were intact and there was no pattern of cracking in the wall finishes.  (*Id.*)  Haag likewise dismissed Jones' theory that hurricane winds had moved the foundation, reasoning that "[w]ind loads on this structure would clearly devastate the wood-framed structure long before enough pressure could be applied vertically to force it into the ground ....  More likely, the foundation has settled due to the sloping lot and soil consolidation."  (*Id.*)  Haag specifically found that Jones' complaints about doors not closing properly, isolated cracks in interior finishes, cabinets separated from the wall, and sloped floors "are conditions that are the result of long term foundation / framing movement. ... These conditions had not occurred suddenly or recently, and cannot be attributed to wind."  (*Id.*)  Haag's conclusion was in direct conflict with the statements of Jones and other witnesses, who indicated that this damage appeared for the first time in the storm.

On November 12, 2005, GICA denied Jones' claim for coverage of foundation movement and finish cracks.  The denial letter relied extensively on the Haag report, and explained GICA's

---

[11]     The Haag engineer elaborated in his deposition that the absence of torn cladding, broken windows, or stripping or distortion of exterior features of the house was compelling evidence that the storm winds lacked sufficient intensity at that location to cause more than cosmetic damage, such that they could not have caused the major structural damage identified by Jones. (English Dep., at 150.)  But plaintiff's evidence calls into question the veracity of Haag's conclusions and the thoroughness of its investigation.  Plaintiff's evidence is that she told GICA representatives that the top of a big tree adjacent to her house (and located right near the area of the roof and attic that Jones claims was damaged) snapped off in the storm (Jones Dep., at 180-81; Jones Aff., at 1), suggesting significant wind forces in the area.  Likewise, Jones points out that the south slope of her roof (which GICA admitted needed replacement because of storm damage) covers the kitchen area where the wall and rafters and joists separated, again suggesting significant winds in the area.  (*Id.*)  Coupled with the statements GICA received from plaintiff and others that the cracks, buckling, and other structural damage did not appear until Hurricane Katrina hit, defendant's reasoning (and the adequacy of its investigation) is at least suspect.  It is no answer for GICA to say, as it does, that it was not on notice of attic damage; to the contrary, defendant was clearly aware that plaintiff was claiming significant structural damage to her house immediately under that area of the attic, plus roof damage immediately above that area of the attic, suggesting that the investigation should have focused there.

findings that "[t]he damages to the insured location which were caused by foundation movement are not subject to coverage." (*Id.* at 348-49.) Based on these conclusions, GICA wrote in the November 12 letter to WaMu (with copy to Jones) that "[w]e must regretfully deny the claim for the foundation damage and finish cracks." (*Id.* at 349.) That November 12 letter also specified that GICA was reserving any and all rights and defenses, that "[n]o waiver or estoppel of any kind is intended nor should be inferred," and that GICA did "not waive any of the terms, conditions or requirements of the insurance policy and we specifically reaffirm them here." (*Id.*) GICA closed its claims file on November 14, 2005. (*Id.* at 342.)

On the very day that GICA closed its file, Jones called GICA and expressed dissatisfaction with its conclusions regarding her claims of cracks and foundation movement. Jones indicated that she wanted another engineer to examine the Property, to which GICA responded that Jones was free to retain her own engineer and forward that engineer's report to GICA. (*Id.* at 340-41.) Jones also stated that she would turn the entire matter over to her attorney. (*Id.*) Plaintiff's counsel made contact with GICA in January 2006. (*Id.* at 333.) As a result, GICA apparently reopened its file and began dealing with counsel directly. As of July 7, 2006, however, GICA wrote in an internal document that "[w]e stand by the denial of the settlement of the home." (*Id.* at 284.)

On January 5, 2007, GICA sent an independent adjuster, Richard Smith of Cunningham Lindsey U.S., Inc., to re-inspect the Property with Jones and her contractor. (*Id.* at 214, 220.) Smith documented his activities and conclusions in a written report dated January 17, 2007. (*Id.* at 220-42.) At plaintiff's contractor's request, Smith accessed the attic area to find roof rafters pulled away from the main ridge beam; however, he observed nothing suggesting that the separation was caused by sudden shifting of the structure as a result of hurricane winds. (*Id.* at 222.) Jones' contractor also pointed out water damage to the ceiling in the downstairs recreation room, including a sagging ceiling; however, Smith indicated that there is "[n]o way to say this is wind [damage] until the ceiling is opened and a visual is done" (*id.*), but that step was not taken. Smith further opined that if Jones' theories about hurricane winds twisting the frame or moving the foundation were valid, "we should have seen collateral damage to the vinyl siding, soffit's [*sic*], and fascia materials. There was no damage to any of these." (*Id.*) Smith ultimately concluded that GICA's original estimate of repairs was a fair assessment of the damage, and that

the winds in Mobile during Hurricane Katrina could not have caused the damage for which Jones now sought coverage. (*Id.* at 223.)[12]

On February 7, 2007, plaintiff's counsel faxed to GICA the handwritten estimate prepared by plaintiff's contractor (Bobby Miller) of claimed damages, totaling $91,573.02. (*Id.* at 168-79.)[13] Miller's estimate did not purport to contain any findings or conclusions as to the source or causes of the structural damage he observed; rather, it was on its face simply an estimate for repairing the damage that Miller observed. Two days later, GICA wrote to plaintiff's counsel to request certain additional information (relating to prior insurance carriers and the Property's claims history) and to indicate that "[o]ur investigation of this matter is not yet complete." (*Id.* at 162.) Based on certain documents in the claims file, the record supports plaintiff's inference that GICA was investigating whether Jones' claimed wind damage might be wind damage from an earlier storm outside the scope of GICA's coverage obligations on the Property.

On February 20, 2007, GICA sent plaintiff's counsel a supplemental claims check of $561.34, as to those portions of Jones' claims that had previously been granted and paid, to make allowance for higher pricing of labor and materials following Hurricane Katrina. (*Id.* at 143-46.) That letter reiterated GICA's position that "our investigation of this matter is not complete" and repeated the insurer's request for information set forth in the February 9 letter. (*Id.*) On March

---

[12]     Taking the record in the light most favorable to plaintiff, there is evidence that Smith expressed a different opinion during the inspection. In particular, plaintiff's contractor testified that Smith voiced 100% agreement with him that the observed damage was caused by Hurricane Katrina, and that GICA would pay for it. (Miller Dep., at 100.) For his part, Smith denies making such statements. (Smith Dep., at 339.) For summary judgment purposes, however, the Court assumes that he did, raising troubling questions as to the disconnect between Smith's stated opinions at the site and the subsequent written conclusions in his report concerning cause of damage. A number of inferences adverse to GICA may be reasonably supported by that discrepancy.

[13]     The largest line items in plaintiff's estimate were $18,750 for removal and replacement of decking, rafters, ceiling joists, the center ridge, fascia boards, siding, soffits and the like because of broken center ridge and cracked rafters; $16,401.08 for removal and replacement of exposed interior beams, drywall, insulation, baseboards and the like; and $9,396.41 for removal and replacement of kitchen cabinets and countertops. (*Id.*)

2, 2007, plaintiff's counsel volleyed back a strongly-worded letter reiterating his previous requests for Smith's report and photographs, implying that GICA might be engaging in spoliation of evidence, accusing GICA of fraud and bad faith, and asserting that GICA was "hid[ing] behind an obviously flawed and bogus Haag engineering report."  (*Id.* at 135-37.) With this heated rhetoric, the tenor of the matter changed considerably, as the parties began jockeying for position as to anticipated litigation, rather than working cooperatively to resolve their differences.

On March 29, 2007, GICA sent plaintiff's counsel a letter, expressly declining to furnish him with a copy of Smith's report (which counsel had requested on multiple occasions) on the ground that Smith "did not complete and [*sic*] estimate of repair."  (*Id.* at 26.)  GICA also responded to the aspersions cast by plaintiff's counsel on Haag.  While standing by Haag's work, and noting its consistency with other inspections of the Property, GICA agreed to get a second opinion from another engineering firm, and forwarded plaintiff's counsel the names and contact information for three independent firms located in Mississippi, with a request that he select one of them to perform an analysis and inspect the Property, at GICA's expense.  (*Id.* at 26-27.)  The March 29 letter again stated that GICA's "investigation of the matter is still incomplete."  (*Id.* at 27.)  When plaintiff's counsel failed to respond to this proposal for selection of an independent engineer, GICA reiterated that proposal in a follow-up letter on April 25, 2007.  (*Id.* at 22.)  In a written response dated May 4, 2007, plaintiff's counsel rebuffed GICA's suggestion for a second opinion on the grounds that GICA's lack of cooperation was evinced by its refusal to produce a copy of the Smith report.  Plaintiff's counsel wrote that it was "clear that [GICA] already made up its mind to deny this claim," that Haag's opinion was irreversibly tainted by its work on other Katrina claims, and that at least one of the firms listed on GICA's "second opinion" list had similar biases.  (*Id.* at 17-18.)  The May 4 letter concluded with plaintiff's counsel's statement that suit would be filed in 30 days unless GICA paid the claim.  (*Id.*)

In six follow-up letters (one per month from May through October 2007), GICA reiterated the proposal of having an independent engineering firm (selected by plaintiff from a GICA-provided list) give a second opinion.  (*Id.* at 7-16, 19-20.)  There was no response. Plaintiff filed suit in the Circuit Court of Mobile County, Alabama on November 12, 2007, advancing claims of breach of contract and bad faith (including both the ordinary and

extraordinary variants of that cause of action).  This action was timely removed to this District Court on grounds of diversity of citizenship, pursuant to 28 U.S.C. § 1332 and 1441.  GICA now moves for entry of summary judgment as to all claims asserted by Jones.[14]

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be

---

[14]     In summary judgment briefing, plaintiff filed a 46-page principal brief (doc. 61), and defendant filed a 22-page reply (doc. 66).  These briefs extend well beyond the page limitations imposed by Local Rule 7.1(b).  That said, Judge Granade authorized the parties to file excess pages; therefore, those memoranda will be considered in their entirety.  Plaintiff's unauthorized 16-page sur-reply is situated somewhat differently.  After all, "[s]ur-replies can only be filed with leave of court and are ordinarily stricken if no such leave is requested or received."  *Mobile County Water, Sewer and Fire Protection Authority, Inc. v. Mobile Area Water and Sewer System, Inc.*, 2007 WL 3208587, *5 n.10 (S.D. Ala. Oct. 29, 2007); *see also Jackson v. Winn-Dixie, Inc.*, 2008 WL 5401641, *1-2 (S.D. Ala. Dec. 29, 2008) (denying non-movant's request to file sur-reply, inasmuch as "no briefing could ever be complete if parties could respond *ad infinitum* merely because they still disagree"); *Wood v. B.C. Daniels, Inc.*, 2008 WL 2163921, *1 n.1 (S.D. Ala. May 21, 2008) (observing that "the filing of sur-replies is discouraged because of the inefficiencies inherent in an interminable thrust-and-parry debate between the parties").  Jones did not request leave of court before filing her sur-reply, and that document largely rehashes arguments that were or could have been made earlier.  Nonetheless, given that (1) GICA failed to object to this unauthorized filing, (2) this case was not assigned to the undersigned when that sur-reply was filed, and (3) the judge to whom the case was assigned did not question or strike that filing, the Court in its discretion will consider plaintiff's sur-reply.

believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.    Analysis.

Defendant's Motion for Summary Judgment identifies three distinct grounds for relief. First, GICA contends that it is entitled to judgment as a matter of law because Jones lacks standing to assert any claims against it.  Second, GICA maintains that summary judgment should be granted in its favor as to all claims because it was still investigating Jones' claims when she filed suit, such that there was no breach of the subject Policy.  Third, GICA contends that Jones' bad faith claims fail because the record reflects both that it had an arguable or debatable reason for its actions and that there was no evidence of a breach of known duty because of self-interest or ill will.  Jones has opposed each of these grounds for Rule 56 relief.

### A.    Standing.

As a threshold matter, GICA contends that Jones' claims must be dismissed for lack of standing, inasmuch as she is neither a named insured nor a third-party beneficiary of the Policy. Plaintiff counters by arguing that GICA has waived any standing objection to coverage and that, even if it has not done so, the Policy confers upon Jones the requisite standing to pursue her claims.

#### 1.    Whether Defendant Waived Its Standing Argument.

Jones asserts that GICA has waived the right to challenge her status as an insured or third-party beneficiary under the Policy because the November 12, 2005 denial letter failed to assert that she was not an insured or a beneficiary as a ground for such denial.  The parties agree that Alabama law controls the waiver analysis.

Plaintiff correctly cites the general rule in Alabama "that an insurer who specifically denies liability on one ground waives all other grounds or defenses it could have raised but did not." *Mutual Service Ins. Co. v. Frit Industries, Inc.*, 358 F.3d 1312, 1323 (11th Cir. 2004); *see also First Ala. Bank v. First State Ins. Co.*, 899 F.2d 1045, 1063 (11th Cir. 1990) ("Under Alabama law, when an insurer specifically denies liability on one ground, it waives other

grounds or defenses it might later seek to assert.").  But that rule is subject to a clear limitation that "the only defenses capable of waiver are those which arise out of an express condition contained in the insurance contract."  *Mutual Service*, 358 F.3d at 1323; *see also First Ala. Bank*, 899 F.2d at 1063 (similar).  Jones fails to explain how GICA's standing argument arises from an express condition contained in the subject Policy.  Moreover, Alabama law is clear that "coverage under an insurance policy cannot be created or enlarged by waiver or estoppel." *Home Indem. Co. v. Reed Equipment Co.*, 381 So.2d 45, 51 (Ala. 1980).[15]  Thus, if GICA is correct that Jones is not an insured or a beneficiary to whom a right to benefits attaches under the Policy, then that coverage matter cannot be deemed waived simply because GICA failed to recite it in its denial letter.  In that event, to adopt Jones' position would be to utilize the doctrine of waiver to create insurance coverage that otherwise would not exist (*i.e.*, effectively expanding or rewriting the Policy to create insurance coverage for Jones), an outcome which is expressly forbidden under Alabama law.  The Court therefore concludes that GICA has not waived its right to challenge Jones' status as an insured or a beneficiary under the subject Policy.[16]

---

[15]     *See also McGee v. Guardian Life Ins. Co.*, 472 So.2d 993, 996 (Ala. 1985) (insurance provisions defining which employees were insured under life insurance contracts "are coverage provisions and thus not subject to waiver"); *Allstate Ins. Co. v. Moore*, 429 So.2d 1087, 1089 (Ala.Civ.App. 1983) ("Established Alabama case law is that insurance coverage cannot be created by estoppel."); *Mason Drug Co. v. Harris*, 597 F.2d 886, 888 (5th Cir. 1979) ("the doctrine of waiver cannot be applied to provide coverage where coverage does not exist under ... the policy contract").

[16]     In so finding, the Court does not embrace GICA's conclusory argument that the "case or controversy" requirement of Article III precludes this coverage issue from ever being waived by an insurer.  GICA's "standing" argument here is separate and distinct from Article III standing.  *See, e.g., Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla.*, 351 F.3d 1112, 1116 (11th Cir. 2003) (constitutional requirements for standing are (1) injury in fact, (2) causal connection between injury and causal conduct, and (3) likelihood that injury will be redressed by a favorable decision).  GICA has not couched its standing argument in terms of any of these constitutional prerequisites, all of which are plainly satisfied here.  Jones claims that she has been wrongfully denied insurance benefits that she, personally, is owed (*i.e.*, an injury in fact).  Whether that claim is meritorious is a separate and distinct question from whether she has properly alleged standing to pursue it.  Furthermore, Jones says GICA caused this injury by breaching the terms of Policy, failing adequately to investigate, and wrongfully denying coverage (*i.e.*, causation).  And she seeks a judgment requiring GICA to pay damages for her loss (*i.e.*, redressability).  Thus, defendant's bare reference to Article III is unavailing because its

-14-

2.       *Jones' Status as to the Policy.*[17]

In support of its standing argument, GICA maintains that "[t]he policy in force on [Ms.] Jones' home does not show any intent to confer a benefit on [Ms.] Jones."  (Doc. 49, at 6.) GICA insists that "[t]here is nothing in the policy or declarations indicating [Ms.] Jones is to enjoy any benefits under the policy" and that "[t]he clear language of the insurance contract does not evidence any intent to confer a benefit upon [Ms.] Jones."  (*Id.* at 6-7.)

Such contentions are simply counterfactual, and ignore the plain language of the Policy. Most notably, the "Loss Payment" provision contains an express promise by GICA that, as to any covered losses exceeding WaMu's interest in the Property, the excess amounts "will be paid to the 'borrower'" by GICA.  (Doc. 53, Exh. A at 300.)  The "borrower" plainly refers to Jones.[18] Under any common-sense, rational reading, the Loss Payment provision evinces a clear intent by GICA to confer a benefit on Jones by promising to pay her for covered losses to the Property to the extent those claims exceed WaMu's mortgage interest.  This intent is reinforced by the Policy's "Limit of Liability" clause, which indicates that GICA would not be liable "to a 'borrower' for more than the amount of a 'borrower's' interest at the time of the loss."  (*Id.* at 298.)  If GICA had not intended to confer a benefit on Jones by paying her for covered losses under the Policy, it would not have been necessary to include a separate provision setting forth a

---

standing objection does not incorporate Article III concerns.

[17]       The parties correctly agree that Jones possessed an insurable interest in the Property.  Alabama law is quite clear on this point.  *See Custer v. Homeside Lending, Inc.*, 858 So.2d 233, 248 (Ala. 2003) ("A mortgagor and a mortgagee each have an independent insurable interest in the property covered by the mortgage, and both interests may be covered by one policy.") (citation omitted).  Thus, the issue presented in GICA's standing argument is not whether Jones possessed an insurable interest in the Property (she plainly did), but whether the Policy recognized and protected that interest by classifying Jones as either an insured or a third-party beneficiary.

[18]       Indeed, "borrower" is defined in the Policy meaning "the mortgagor or mortgagors of the 'insured location' indebted under a mortgage held or serviced by" WaMu.  (*Id.* at 289.)  It is uncontroverted that (a) WaMu held a mortgage for the Property; (b) the Property was the "insured location" for purposes of the Policy; and (c) Jones was the mortgagor for the Property.  Thus, the term "borrower" as used in the Policy could only be referring to Jones, notwithstanding its failure to reference her by name.

limit on the payments it would make to her.  The Court therefore rejects GICA's unfounded argument that the Policy is devoid of language conferring a benefit on Jones.

Alternatively, GICA contends that even if the Loss Payment provision does benefit Jones, it confers only an incidental benefit on her, and therefore cannot give her standing to enforce the Policy.  GICA is correct that, under Alabama law (which the parties agree is controlling), a non-party to a contract has no right to sue for breach of same unless the contracting parties intended to bestow a direct (rather than incidental) benefit on her, rendering that non-party a third-party beneficiary of the contract.  *See, e.g., Edwards v. Costner*, 979 So.2d 757, 763 (Ala. 2007) ("In order for a person to be a third-party beneficiary of a contract, the contracting parties must have intended to bestow benefits on third parties.") (citation omitted); *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So.2d 18, 24 (Ala. 2002) (recognizing that "third-party-beneficiary principles focus upon the intent of the contracting parties" and specifically whether the contracting parties intended, at the time of contract formation, to bestow a direct benefit upon the complainant) (citations omitted); *Ex parte Scott Paper Co.*, 634 So.2d 546, 548 (Ala. 1993) ("A party seeking to recover in contract as a third-party beneficiary must establish that the contracting parties intended, at the time of the contract, to bestow a direct, as opposed to an incidental, benefit on him.").

Where GICA's argument stumbles, however, is in its characterization of the Loss Payment clause as conferring merely an "incidental benefit" on Jones, thereby preventing her from enjoying third-party beneficiary status.  That clause provides that in the event of a covered loss to the Property, GICA would pay Jones (the "borrower"), after first compensating WaMu up to the amount of its interest in the Property, up to the full amount of Jones' interest in the Property.  In other words, if the Property sustained $70,000 in covered losses, and WaMu's mortgage interest in the Property was $5,000, the Policy set forth GICA's promise to pay Jones the remaining $65,000 in coverage for the loss.  There is nothing incidental about that benefit, particularly given that Jones had no other coverage and therefore no other means of reimbursement in the event of hurricane damage or other covered loss to her home.  The direct beneficiary status of Jones is reinforced by the fact that GICA dealt with Jones during the claims-handling process, and addressed her claims and concerns without ever brushing her aside on the grounds that she lacked standing to procure any benefits under the Policy.  Surely GICA

-16-

would not have interacted with Jones in this manner if it had intended her to have merely incidental rights or benefits under the Policy.[19]

Notwithstanding the foregoing, GICA relies heavily on *Custer v. Homeside Lending, Inc.*, 858 So.2d 233 (Ala. 2003), for the proposition that Jones is merely an incidental beneficiary of the Policy. But *Custer* is inapposite. The plaintiffs in *Custer* were borrowers who sued their mortgage lender on theories that the lender obtained force place flood insurance in amounts exceeding their mortgage loan balance, in violation of federal law; and that the lender's mortgage servicing agreement with a company called WNC was breached when the lender bought excessive flood insurance for the borrowers' property. After the lower court entered summary judgment in the lender's favor, the borrowers appealed, arguing *inter alia* that they were third-party beneficiaries to the servicing agreement between the lender and WNC. Notably, the Alabama Supreme Court in *Custer* did not have occasion to consider whether the plaintiffs were or were not third-party beneficiaries under the applicable insurance policy, as no coverage or bad faith claims against the insurer were presented on appeal. In deciding the claims that were presented, the *Custer* court noted that the servicing agreement had no apparent application to the plaintiffs' claims; that the borrowers failed to explain how or by whom the servicing agreement was allegedly breached; and that the servicing agreement said nothing about the lender's placement of flood insurance in excess of its interest in the property. Because the servicing agreement was neutral as to its intent to benefit them, the Alabama Supreme Court found that the borrowers were not third-party beneficiaries thereunder, such that its inquiry could stop at that point. *Id.* at 249. The facts and circumstances in *Custer* are materially and substantially distinguishable from those in the case at bar, inasmuch as: (1) here, the relevant

---

[19]     To be clear, the Court is not suggesting that GICA waived the right to contest Jones' status under the Policy. As discussed *supra*, it did not. Rather, the point is that the surrounding circumstances of the parties' course of dealing strongly suggest that GICA, WaMu and Jones all perceived Jones to be an intended direct beneficiary of the Policy's coverage provisions, at least until GICA announced otherwise in its Motion for Summary Judgment. This course of dealing is relevant and properly considered in ascertaining whether GICA and WaMu (the contracting parties) intended for Jones to be a third-party beneficiary under the Policy. *See, e.g., Harris Moran Seed Co. v. Phillips*, 949 So.2d 916, 920-21 (Ala.Civ.App. 2006) ("In determining third-party-beneficiary status, it is permissible for the court to look at the surrounding circumstances as well as the agreement itself.").

-17-

contract is an insurance policy that expressly provided for insurance to protect Jones' interests, not just those of WaMu; (2) that Policy is at the core of Jones' claims; (3) Jones is suing the insurer for breach of the Policy, not the lender on an amorphous, ill-defined theory of breach of a servicing agreement; and (4) unlike the *Custer* service agreement, the Policy in this case directly, unequivocally expresses an intent to benefit Jones directly via the Loss Payment provision.  For all of these reasons, GICA's Rule 56 motion is not advanced by its last-stand invocation of *Custer*.[20]

Although the parties have not provided (and the Court has not found) any Alabama authority directly on point, several authorities from other jurisdictions are persuasive in bolstering the determination that Jones is indeed a third-party beneficiary under the Policy.  For example, in *Palma v. Verex Assur., Inc.*, 79 F.3d 1453 (5ᵗʰ Cir. 1996), the Fifth Circuit concluded that a borrower was a third-party beneficiary under a contract for mortgage insurance entered into between her lender and the mortgage insurer, where at least one condition of that contract unequivocally benefitted the borrower only by precluding the insurer from holding her liable for any loss paid to the lender under the contract.  *Id.* at 1457.  Because the insurance contract was

---

[20]    To be sure, *Custer* does contain language stating that where the lender "had the contractual right under the mortgage agreement to exercise its discretion in deciding whether to insure a mortgaged property only to the extent of its interest in the property, or to insure also the borrower's interest, any benefit received by the Custers would have been merely incidental, thereby precluding a third-party-beneficiary claim."  *Custer*, 858 So.2d at 249.  However, this reasoning does not aid GICA here because, in the first place, it is *dicta*, and in the second place, GICA has failed to point to any record evidence showing that WaMu's mortgage agreement with Jones conferred upon it the discretion to insure either its own interest or, if it wished, the borrower's interest too.  The summary judgment record is entirely silent as to how the force place insurance coverage for the Property came to include a provision insuring Jones' interests, as well as those of WaMu, so there is no evidentiary basis for concluding (as GICA would have this Court do) that it was an entirely discretionary decision by WaMu that conferred no enforceable rights or standing upon Jones.  More generally, the Court does not believe it to be an accurate statement of law that a non-party receiving a direct benefit under a contract is barred from asserting a third-party beneficiary claim if the contracting parties' decision to structure their contract in a manner conferring such a direct benefit upon her was discretionary rather than compelled.  If the contracting parties elected to confer a direct benefit on a third party in their contract, it should be of no consequence whether their motivations in doing so were altruistic or mercenary, volunteer or conscripted.  Either way, that third-party beneficiary should be eligible to sue to enforce the agreement.

actually made, in part, for the borrower's benefit, and because she was specifically identified as the borrower in the contract (such that she was not a stranger thereto), the Fifth Circuit concluded that the borrower was an intended third-party beneficiary of the mortgage insurance contract. *Id.* at 1458. Analogous reasoning would lead to the same result in this case. Similarly, in *Schlehuber v. Norfolk & Dedham Mut. Fire Ins. Co.*, 281 So.2d 373 (Fla. App. 3 Dist. 1973), the appellate court found that a mortgagor was a third-party beneficiary to a fire insurance policy with a loss payment provision stating that the insurer would pay the mortgagees the extent of their losses as their interests appeared. *Id.* at 375; *see also Wunschel v. Transcontinental Ins. Co.*, 839 P.2d 64, 70 (Kan. App. 1992) (property owner identified in "loss payable" provision of contract between lessee and insurer is a third-party beneficiary). Finally, although the issue is slightly different, the Court finds illuminating the explanation of one commentator that "[i]f a mortgagee obtains insurance covering the interest of both parties in the property without the knowledge or consent of the mortgagor, the mortgagor may accept that policy as a contract made for his or her benefit. ... Acceptance and ratification of such a policy may be signified by the mortgagor bringing an action against the insurer to enforce the contract." *Couch on Insurance* (3rd ed.), § 40:20 (footnotes omitted).[21]

---

[21] The Court deems the foregoing out-of-district authorities more helpful and comparable to the case at bar than *Mergenthal v. Star Banc Corp.*, 701 N.E.2d 383 (Ohio App. 12 Dist. 1997), which GICA champions for the proposition that "as a general rule, a mortgagor cannot claim the advantage of insurance effected by the mortgagee." *Id.* at 385. *Mergenthal*, much like *Custer*, involves a situation drastically different from that presented here. In *Mergenthal*, the mortgagor sued the mortgagee (not the insurer) claiming that the mortgagee had mishandled an insurance settlement without the mortgagor's involvement. The *Mergenthal* court found no evidence that the mortgagee had ever promised to involve the mortgagor in the claims settlement process. More importantly, the *Mergenthal* court did not identify any loss payment provisions that might place that case in a similar posture to Jones' claims against GICA. There is no indication that the *Mergenthal* policy extended any benefit whatsoever to the mortgagor, or that it did anything beyond protecting the mortgagee's interest in the insured premises. As such, *Mergenthal* is of negligible utility in the third-party beneficiary analysis presented here for the simple reason that the pivotal policy language on which the analysis turns in this case was evidently absent from *Mergenthal*. It is that policy language which removes this case from the *Mergenthal* "general rule" paradigm, if indeed such a general rule exists. The Court cannot accept GICA's misleading contention that *Mergenthal* involves "nearly identical facts" to those in the case at bar. (Doc. 49, at 7.)

-19-

For all of the foregoing reasons, the Court concludes that Jones was a third-party beneficiary of the Policy because the Policy language and surrounding circumstances clearly demonstrate an intent by the mortgagee and insurer to confer a direct benefit on her.  As a third-party beneficiary, Jones has standing to pursue her claims against GICA in this action; therefore, defendant's Motion for Summary Judgment is **denied** insofar as it seeks dismissal of the Complaint for want of standing.[22]  *See, e.g., Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1306-07 (11th Cir. 2008) (plaintiffs "clearly had standing to sue for damages under the Policy" where complaint alleged that plaintiffs had a mobile home, that defendant issued insurance policy covering hurricane damage to that mobile home, that a hurricane in fact damaged the mobile home, that plaintiffs made a claim under policy for those damages, and that defendant paid less than plaintiffs claimed they were owed); *Harris Moran Seed Co. v. Phillips*, 949 So.2d 916, 931 (Ala.Civ.App. 2006) ("It is a well-established principle of Alabama law that a contract made for the benefit of a third person may, at his election, be accepted and enforced by him.") (quoting *Georgia Power Co. v. Partin*, 727 So.2d 2, 5 (Ala. 1998)); *Airlines Reporting Corp. v. Higginbotham*, 643 So.2d 952, 954 (Ala. 1994) ("We recognize that under Alabama law a direct third-party beneficiary may sue on the contract.").

### B.    Whether Jones Filed Suit Before any Breach by GICA.

As an alternative ground for seeking summary judgment, GICA maintains that all of Jones' claims are foreclosed because GICA never breached the Policy.  GICA's position is that Jones filed suit while its claims investigation process was still underway, such that there has never been a breach or nonperformance by GICA, which is a prerequisite for both breach of

---

[22]    A contrary ruling would effectively write the "Loss Payment" provision out of the Policy by rendering it unenforceable.  As mentioned, that section of the Policy contained an express promise by GICA that "[a]mounts payable in excess of [WaMu's] interest will be paid to the 'borrower' ...."  (Doc. 53, Exh. A, at 300.)  WaMu would have no apparent reason to enforce this provision because, by definition, it is triggered only after WaMu has been made whole.  If GICA's stance were correct, however, Jones (the obvious intended beneficiary of that promise) cannot sue to enforce it either.  As such, GICA would have this Court find that its promise to pay Jones lacks any enforceability mechanism whatsoever, leaving GICA free to comply or not, in its unfettered discretion.  Such a one-sided, unfair result would make no sense and would be tantamount to judicial rewriting of the Policy to GICA's advantage.  This the Court cannot and will not do.

contract and bad faith claims under Alabama law.  *See Cook's Pest Control, Inc. v. Rebar*, ---
So.2d ----, 2009 WL 418074, *10 (Ala. Feb. 20, 2009) (stating that elements of a breach of
contract claim in Alabama include valid contract, plaintiff's performance under the contract,
defendant's nonperformance, and resulting damages); *White v. State Farm Fire & Cas. Co.*, 953
So.2d 340, 348 (Ala. 2006) (explaining that plaintiff in a bad faith case "has always had to prove
that the insurer breached the insurance contract") (citation omitted); *New Hampshire Ins. Co. v.
Blue Water Off Shore, LLC*, 2009 WL 792530, *15 (S.D. Ala. Mar. 23, 2009) (observing that
both normal and abnormal bad faith claims in Alabama require as an element "an intentional
refusal to pay the insured's claim").

This contention need not long detain the Court.  It is undisputed that GICA sent a letter to
WaMu and Jones in November 2005, stating in pertinent part as follows: "We have completed
our investigation of the claim submitted for foundation damage to the property located at 1712
Chase Drive, Saraland, Al 36571. ... [*W*]*e must regretfully deny the claim for the foundation
damage and finish cracks*."  (Doc. 53, Exh. A, at 348-49 (emphasis added).)  Other documents
in the claims file show that GICA closed its file and changed the claim status to "INACTIVE" at
that time.  (*Id.* at 3, 342.)  Based on that unequivocal denial letter and the surrounding evidence,
a reasonable finder of fact could readily conclude that the nonperformance element of Jones'
breach of contract and bad faith claims was satisfied.  Given this substantial evidence of denial
of Jones' insurance claim, GICA is not entitled to summary judgment on the theory that there
was no such denial.[23]

---

[23]      In so concluding, the Court recognizes GICA's position that it subsequently
reopened the claim, performed additional investigation, and assured Jones' attorney numerous
times in the months preceding the filing of this lawsuit that the investigation had not concluded.
However, defendant does not proffer either argument or authority explaining how its post-denial
conduct effectively negates or erases its November 2005 denial letter for liability purposes.  The
Court will not develop these arguments for movant.  At any rate, Alabama case law appears to be
the contrary, indicating that post-denial conduct is irrelevant for bad-faith liability.  *See State
Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 316 n.6 (Ala. 1999) ("information received by
the insurer *after* the date of the denial is irrelevant to the determination of whether the insurer
denied at that date in bad faith") (citation omitted); *Berry v. United of Omaha*, 719 F.2d 1127,
1128-29 (11th Cir. 1983) (under Alabama law, plaintiff can maintain action against insurer for
bad faith where insurer refuses to pay, even if insurer later relents and pays the claim prior to
commencement of suit).  Nor is the Court persuaded by the footnote in GICA's reply brief

Even setting aside the denial letter, the Court finds sufficient evidence of constructive denial for Jones to overcome summary judgment on that basis.  "In Alabama, a plaintiff can establish a constructive denial in two ways: (1) by showing that the passage of time is so great that the delay alone creates a denial; or (2) by showing sufficient delay in payment coupled with some wrongful intent by the insurance company."  *Congress Life Ins. Co. v. Barstow*, 799 So.2d 931, 938 (Ala. 2001) (citations and internal quotation marks omitted).  Jones made this claim in fall 2005; however, GICA still had not paid it as of November 2007, more than two years later, when this suit was filed.  Notwithstanding GICA's efforts to shift the blame for the delay to Jones, a reasonable finder of fact could conclude that GICA had all the information it needed to make a final decision long before November 2007, and that Jones in no way obstructed or interfered with GICA's investigation.[24]  As identified in plaintiff's briefs, there is also record evidence from which reasonable inferences call into question whether GICA had a wrongful intent in delaying payment on the claim.  Thus, both forms of constructive denial have been adequately shown here to survive Rule 56 scrutiny.

Because there are, at a minimum, genuine issues of material fact as to whether GICA actually or constructively denied Jones' claim for insurance benefits, defendant is not entitled to judgment as a matter of law on the ground that it never denied coverage.  Accordingly, the Motion for Summary Judgment is **denied** insofar as it is predicated on the notion that GICA

---

suggesting that the November 2005 letter was not really a denial letter because it did not deny coverage for wind damage.  (Doc. 66, at 9 n.6.)  The whole point of Jones' breach of contract cause of action is that her insurance claims for foundation damage, cracking, etc. were the result of wind damage, a covered peril, such that GICA's denial of such claims would amount to a breach of the Policy.  Of course, whether Jones' losses were or were not caused by wind damage is a question of disputed fact that cannot be resolved on summary judgment.

[24]    Defendant balks that Jones rejected and/or failed to respond to its repeated offers to have another engineering firm examine the Property, thereby contributing to the delay.  But there is no indication in the record that Jones prevented GICA from completing its investigation or obtaining a second opinion concerning the cause of the damage.  If GICA had deemed it important to its investigation to have another engineering firm inspect the Property before making a (second) final coverage decision, it certainly could have done so, with or without "buy-in" from Jones.  There is no reason to think that Jones would not have permitted that engineer to inspect her Property.  Thus, the delays in GICA's investigation and coverage decision do not appear attributable to Jones.

never denied Jones' claim and therefore is not in breach of its Policy obligations.

        ***C.       Bad Faith Claims.***

      Next, GICA contends that summary judgment is warranted on plaintiff's normal and abnormal bad faith claims for several reasons. The Court need not address all of them, however, because it agrees with GICA that Jones' status as a third-party beneficiary to the Policy bars her from prosecuting claims predicated on GICA's alleged bad-faith denial of benefits.

      As a general rule, Alabama law confines bad faith claims to situations where there is an insurance contract between the parties. *See Stewart v. State Farm Ins. Co.*, 454 So.2d 513, 514 (Ala. 1984) (under Alabama law, "the tort of bad faith refusal to pay is that refusal to pay valid claims made by the insured of his insurance carrier"); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1077 (S.D. Ala. 2007) (explaining that, for both ordinary and extraordinary bad faith claims, Alabama law requires plaintiff to show, *inter alia*, "the existence of an insurance contract between the parties"). Indeed, the Alabama Supreme Court has explained in no uncertain terms that "a party cannot bring an action against an insurance company for bad-faith failure to pay an insurance claim ***if the party does not have a direct contractual relationship with the insurance company***." *Williams v. State Farm Mut. Auto. Ins. Co.*, 886 So.2d 72, 75-76 (Ala. 2003) (emphasis added). The limitations on the scope of the bad faith tort in Alabama, and the Alabama Supreme Court's marked reluctance to relax those limitations, are accurately summarized as follows:

> "The tort of bad faith refusal to pay a claim has heretofore been applied ***only in those situations where a typical insurer/insured relationship existed***; that is, where the insured or his employer entered into a written contract of insurance with an insurer and premiums were paid into a central fund out of which claims were to be paid. ***We are very hesitant to expand the tort beyond these narrow circumstances***."

*Peninsular Life Ins. Co. v. Blackmon*, 476 So.2d 87, 89 (Ala. 1985) (emphasis added); *see also Metmor Financial, Inc. v. Commonwealth Land Title Ins. Co.*, 645 So.2d 295, 297 (Ala. 1993) (for tort cause of action for bad faith to arise, "[a]n insurer-insured relationship must exist"); *Berry v. United of Omaha*, 719 F.2d 1127, 1128 (11th Cir. 1983) (explaining that Alabama gives "insurance policy holders (but not third party beneficiaries) an action in tort, in addition to their contract action, against an insurance company that refused payment of a claim ...").

Thus, Alabama courts have circumscribed the tort of bad-faith refusal to pay to circumstances in which there is a direct contractual relationship between plaintiff and insurer, and a typical insurer/insured relationship exists.  Nothing in plaintiff's filings or the Court's own research supports a conclusion that third-party beneficiaries such as Jones may invoke the tort of bad faith against insurers in Alabama.[25]  In fact, Jones' briefs are devoid of any argument or analysis that third-party beneficiaries are entitled to bring bad faith claims under Alabama law. Simply put, Jones proffers no authorities and makes no arguments that, despite the Eleventh Circuit's opinion to the contrary in *Berry*, the necessity of a direct contractual relationship identified in *Williams*, and the Alabama Supreme Court's hesitance to enlarge the tort as described in *Peninsular Life*, Alabama courts would expand the tort of bad faith to allow third-party beneficiaries to assert such a claim against insurers.

Instead, plaintiff's only attempts to rebut this ground for summary judgment are rooted in insistence that she is an insured, not merely a third-party beneficiary, under the GICA Policy. (Doc. 61, at 5-6, 11; doc. 75, at 2-4.)  Alabama courts routinely look to the language of the

---

[25]    The Eleventh Circuit in *Berry* found that Alabama law does not allow such claims.  Courts in other jurisdictions are mixed on this point.  Several jurisdictions have explicitly barred third-party beneficiaries from bringing bad faith causes of action.  *See, e.g., Cain v. Griffin*, 849 N.E.2d 507, 515 (Ind. 2006) (under Indiana law, "a third-party beneficiary cannot sue an insurer in a tort action for the insurer's failure to deal in good faith with a third-party beneficiary"); *First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland*, 928 P.2d 298, 307 n.31 (Okla. 1996) ("A claim for bad-faith tort is available only to the insured.  A third-party beneficiary may be viewed as a stranger to the contract and hence lacks standing to bring a bad-faith claim.").  By comparison, other jurisdictions have allowed such claims.  *See Helicopter Transport Services, Inc. v. Erickson Air-Crane Inc.*, 2008 WL 151833, *4 n.4 (D. Or. Jan. 14, 2008) ("It seems peculiar to hold that a contracting party must act in good faith regarding the other contracting party, yet may act in bad faith toward a third party beneficiary to whom the parties intended to create a direct obligation ...."); *Progressive Exp. Ins. Co. v. Scoma*, 975 So.2d 461, 465 (Fla.App. 2 Dist. 2007) ("In Florida, a bad faith action against an insurance company may be brought not only by the insured to whom the duty of good faith was owed ..., but also by a third party whose claim against the insurance policy was the subject of alleged bad faith."); *Bergerud v. Progressive Cas. Ins.*, 453 F. Supp.2d 1241, 1249 (D. Nev. 2006) (predicting that Nevada law would find that a third-party beneficiary of an insurance policy may bring a bad faith claim against the insurer for failing to deal fairly); *Ames v. Sundance State Bank*, 850 P.2d 607, 611 (Wyo. 1993) ("A tort claim of 'bad faith' can be asserted only by a party to a contract or by a third party beneficiary to an enforceable contract.").  Plaintiff has identified no basis for concluding that Alabama either does or would fall into the latter category.

policy to determine whether a particular person is or is not an insured.  *See, e.g., Lambert v. Coregis Ins. Co.*, 950 So.2d 1156 (Ala. 2006) (construing policy language to determine whether plaintiff was an insured); *City of Rainsville v. State Farm Mut. Auto. Ins. Co.*, 716 So.2d 710, 713 (Ala.Civ.App. 1998) (enforcing policy terms as written and looking to definition of insured in policy to determine whether plaintiff was an insured).  Moreover, Alabama law is clear that "[i]nsurance contracts are to be enforced as they are written, as long as there is no ambiguity in the provisions involved."  *Progressive Speciality Ins. Co. v. Green*, 934 So.2d 364, 367 (Ala. 2006) (citations omitted).[26]  For that reason, this Court can neither ignore nor rewrite unambiguous policy language to determine whether Jones is or is not an insured.

Here, the declarations page identifies the insured as "Washington Mutual Bank, FA Its Successors and/or Assigns."  (Doc. 53, Exh. A, at 128.)  Plaintiff admits that WaMu is the only named insured.  (Doc. 61, at 5.)  She does not suggest that she is a successor or assignee of WaMu.  Nor does she point to any Policy language identifying her as an insured, an additional insured, or having any insured status.  To be sure, Jones relies on language showing that she is an intended beneficiary under the Policy, such as the "Loss Payment" provision reflecting that she is eligible for payment to the extent that a covered loss exceeds the amount of WaMu's interest in the Property.  But Jones offers no legal or logical basis for parlaying her right to proceeds under the Policy under certain circumstances into a conclusion that she must be deemed an "insured" thereunder.  To say that she is an intended beneficiary under the Policy (as this Court has previously found) is a far cry from saying that she is an insured, yet Jones would make the unwarranted, unexplained logical leap that the former necessarily gives rise to the latter.

---

[26]     *See also Progressive Specialty Ins. Co. v. Naramore*, 950 So.2d 1138, 1141 (Ala. 2006) ("Insurance contracts are to be enforced as they are written, as long as there is no ambiguity in the provisions involved.") (citations omitted); *Shrader v. Employers Mut. Cas. Co.*, 907 So.2d 1026, 1034 (Ala. 2005) ("If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy ... by making a new contract for the parties.") (citation omitted).  Although Jones' summary judgment briefs cite to certain stray notations in the claims file in which GICA sporadically referred to her as "Insured" or "Insd," rather than as "borrower," plaintiff has made no showing of policy ambiguity that would allow these extrinsic materials to be considered in construing the Policy.  *See, e.g., McIntosh v. Livaudais*, 979 So.2d 92, 95 (Ala.Civ.App. 2007) ("Extrinsic evidence may be admitted to interpret a contract only if the court finds that the contract is ambiguous.").

This Court will not obliterate the distinction between insurance beneficiaries and insureds in this manner.[27]

Leaving aside her somewhat circular contention that she is an insured and not a beneficiary because she is entitled to benefits under the Policy (which would be equally true whether she was an insured or a beneficiary), Jones' stance that her right to benefits transforms her into an "insured" for purposes of this lawsuit cannot obscure several fundamental points. Whatever Jones may consider herself to be under the Policy, there is certainly no "direct contractual relationship" between Jones and GICA, as is required pursuant to *Williams* to sustain a claim of bad faith under Alabama law.[28]  Additionally, Jones' relationship to GICA cannot reasonably be characterized as a "typical insurer/insured relationship," which *Peninsular Life* states is necessary to support the tort of bad-faith refusal to pay an insurance claim.  The tort of bad faith is a narrow one under Alabama law.  Plaintiff has not identified a single case in which Alabama courts have expanded the tort to permit one similarly situated to her to pursue it, and this Court has no reason to believe that Alabama courts would do so in this instance.

---

[27]     Nor is plaintiff's position aided by her reliance on an Eleventh Circuit case recognizing that "[i]t is unnecessary for a person to be described by name to be an insured under a policy, if his identity can be determined from the description in the policy." *Industrial Chemical & Fiberglass Corp. v. North River Ins. Co.*, 908 F.2d 825, 830 (11th Cir. 1990).  In *Industrial Chemical*, the applicable policy contained an endorsement providing that all vendors of Reichhold products were additional insureds.  It did not name those vendors; however, the Eleventh Circuit concluded that because Industrial Chemical was a long–time vendor of Reichhold products, it was an additional insured, notwithstanding the policy's failure to name it.  Here, by contrast, there were no categories or groups of additional insureds spelled out in the Policy, and nothing stating that anyone other than WaMu was an insured.  For example, the Policy did not delineate the "borrower" as an additional insured for property damage claims, as would be needed to bring this case within the ambit of *Industrial Chemical*.

[28]     In that regard, it bears noting that there is no evidence that Jones negotiated the Policy with GICA or that GICA issued the Policy to her.  Rather, all indications in the record are that GICA issued the Policy directly to WaMu, that claims checks and claims correspondence were addressed directly to WaMu, and that all claims payments by GICA were made solely to WaMu, not to Jones.  These ancillary facts reinforce the point that, at best, Jones' contractual relationship with GICA for property coverage was indirect, not direct.  *Williams* teaches that the absence of such a direct contractual relationship is fatal to plaintiff's attempt to bring bad faith claims against GICA under Alabama law.

In sum, then, the Court finds that Jones is ineligible to bring claims of bad faith against GICA because she is a third-party beneficiary, she lacks a direct contractual relationship with GICA, and there is no typical insurer/insured relationship as between GICA and Jones. Inasmuch as Alabama courts have not allowed persons in Jones' position to bring claims under the narrow tort of bad-faith refusal to pay, GICA is entitled to judgment as a matter of law in its favor on both the normal and abnormal bad faith claims.[29]

## IV.    Conclusion.

For all of the foregoing reasons, Defendant's Motion for Summary Judgment (doc. 48) is **granted in part**, and **denied in part**.  The Motion is **granted** as to the Second Cause of Action (normal bad-faith refusal to pay) and the Third Cause of Action (abnormal bad-faith refusal to pay) because of the absence of a direct contractual relationship between plaintiff and defendant. The Second and Third Causes of Action are **dismissed with prejudice**.  In all other respects, the Motion for Summary Judgment is **denied**.  This action remains set for a Final Pretrial Conference before the undersigned on July 7, 2009 at 9:00 a.m., with jury trial to follow in the August 2009 term.

DONE and ORDERED this 29th day of May, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[29]    In light of its determination that Jones may not bring claims of normal or abnormal bad faith against GICA because of her lack of a direct contractual relationship with GICA, the Court need not consider defendant's remaining arguments for summary judgment on the bad faith causes of action, namely, that the normal bad faith claim should be dismissed because the record establishes a debatable reason for denying Jones' claim and that the abnormal bad faith claim should be dismissed for want of evidence that GICA breached a known duty through some motive of self-interest or ill will.